IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:23-cr-6-MOC |
| | ) | |
| v. | ) | **BILL OF INDICTMENT** |
| | ) | |
| (1) RICHARD BRASSER | ) | 26 U.S.C. § 7202 |
| | ) | 26 U.S.C. § 7206(1) |
| (2) GREGORY GENTNER | ) | 26 U.S.C. § 7201 |

---

### THE GRAND JURY CHARGES:

At the specified times and at all relevant times:

#### Introductory Allegations

1.      rFactr was a company with offices in Charlotte, North Carolina, that sold software and provided ongoing support for that software to companies that were leveraging their social networks as part of their sales platforms. On or about May 30, 2013, rFactr changed its name from The Targeted Group, which was incorporated in Charlotte, North Carolina on or about February 22, 2000. rFactr ceased day-to-day operations in and around late 2017.

2.      RICHARD BRASSER was a resident of Charlotte, North Carolina. Beginning in or about 2002, BRASSER was the Chief Executive Officer, a shareholder, and a director of rFactr.

3.      GREGORY GENTNER was a resident of Charlotte, North Carolina. Beginning in or about 2006, GENTNER was the Chief Financial Officer, a shareholder, and a director of rFactr.

4.      Between 2013 and 2017, rFactr raised at least $4.4 million from numerous investors. rFactr maintained Regions checking account x4500 and Regions savings account x9851.

5.      BRASSER and GENTNER exercised control over rFactr's business and financial affairs by, among other acts, having signature authority on, and control over, rFactr's bank accounts, deciding which bills were paid, hiring and firing employees, negotiating contracts, and signing tax returns. BRASSER and GENTNER were responsible persons for collecting trust fund taxes and accounting for employment taxes by filing Forms 941 with the Internal Revenue Service ("IRS") and paying over to the IRS the employment taxes for rFactr's employees.

1

6.     From the first quarter of 2015 through the last quarter of 2017, BRASSER and GENTNER caused rFactr to collect more than $600,000 in trust fund taxes from the wages of its employees but did not timely account for and pay over these taxes to the IRS.

## Employment Tax Withholding

7.     The IRS was an agency of the United States Department of Treasury responsible for administering the tax laws of the United States including the ascertainment, computation, assessment, and collection of income taxes and employment taxes.

8.     Pursuant to the Internal Revenue Code and associated statutes and regulations, employers are required to withhold amounts from their employees' gross pay including Federal Insurance Contribution Act ("FICA") taxes, which represent Social Security and Medicare taxes, and federal income taxes (collectively "trust fund taxes."). Employers hold the withheld amounts of trust fund taxes in trust until paid over to the IRS. Employers are required to remit these withheld trust fund amounts to the IRS on a quarterly basis, no later than the last day of month following the end of the quarter.

9.     In addition to the trust fund taxes that must be withheld from pay, employers are separately required to make contributions under FICA for Social Security and Medicare in amounts matching the amounts withheld from their employees' pay for those purposes. Such employer contributions are likewise required to be remitted to the IRS no later than the last day of the month following the end of the quarter. Collectively, these five components required to be remitted quarterly are commonly referred to as "employment taxes," made up of the trust fund taxes withheld (individual income, Social Security and Medicare taxes) and the matching amounts contributed by the employer.

10.     Employers are required to file, one month after the conclusion of the calendar quarter, an Employer's Quarterly Federal Tax Return, Form 941 ("Form 941"), setting forth the total amount of income taxes withheld, the total amount of Social Security and Medicare taxes due, and the total tax deposits.

11.     To ensure remittance by employers of employment taxes following the end of each quarter, the IRS has statutory authority to act in case of delinquency, including the legal power to levy employers' bank accounts and lien assets to satisfy the obligation to pay over amounts due for employment taxes.

12.     When a business fails to pay over the employment taxes, the IRS can assess the unpaid employment taxes against the business. If the business cannot pay the full amount of the assessed liability at one time, the business can apply for a payment plan, called an installment agreement, by submitting to the IRS an IRS Form 433-B, Collection Information Statement for Businesses, ("Form 433-B"), among other documents. The person completing the Form 433-B on behalf of the business must truthfully report all income, assets, and liabilities of the business

2

on the Form 433-B and other documents submitted to the IRS so the IRS can evaluate the proposed installment agreement.

13.     A person is responsible for collecting, accounting for, and paying over the employment taxes if he or she has the authority required to exercise significant control over the employer's financial affairs, regardless of whether the individual exercised such control in fact. More than one person may be considered a "responsible person" for the purpose of collecting, accounting for, and paying over employment taxes, including trust fund amounts and employers' matching amounts.

14.     If a person that the IRS determines to be a responsible person fails to pay over the trust fund taxes, the IRS may impose a penalty of one hundred percent of the trust fund taxes on each responsible person, individually. This penalty is known as the Trust Fund Recovery Penalty ("TFRP").

15.     A person who owes a TFRP can attempt to negotiate a settlement called an Offer in Compromise by submitting to the IRS an IRS Form 656, Offer in Compromise ("Form 656") and an IRS Form 433-A, Collection Information Statement for Wage Earners and Self-Employment Individuals, ("Form 433-A"), among other documents. The person must truthfully report all his income, assets, and liabilities to the IRS on the Form 433-A and other documents submitted to the IRS so the IRS can evaluate the Offer in Compromise and determine the person's ability to pay the taxes due.

16.     The IRS provides taxpayers the opportunity to come into tax compliance through the Voluntary Disclosure Program. A voluntary disclosure occurs when a taxpayer provides a truthful, timely, and complete disclosure to IRS-Criminal Investigation through designated procedures concerning their past tax non-compliance. The voluntary disclosure requires a taxpayer to cooperate with the IRS in determining their correct tax liability and make good faith arrangements with the IRS to pay, in full, the tax, interest, and any applicable penalties owed by the taxpayer.

### BRASSER and GENTNER's Non-Compliance with Accounting For and Paying Over rFactr's Employment Tax Obligations

17.     Between 2013 and 2017, BRASSER and GENTNER failed to comply with rFactr's employment tax obligations by, including but not limited to: failing to timely file rFactr's employment tax returns and failing to timely pay over to the IRS rFactr's employment taxes.   In total, BRASSER and GENTNER caused rFactr to owe more than $1.1 million in employment taxes.

18.     BRASSER and GENTNER caused rFactr to fail to file most of the required Forms 941 for quarters in 2013 and 2014; they also failed to fully pay the employment taxes to the IRS for those quarters at the time they were due and owing.

3

19.     On or about August 1, 2014, the IRS initiated a collection action concerning rFactr's failure to account for and timely pay over rFactr's employment taxes in 2013 and 2014. As a result, on or about December 16, 2014, the IRS issued rFactr a Notice of Federal Tax Lien for $17,148.39 for the outstanding balances for the employment taxes for most of the quarters in 2013 and the first two quarters of 2014.

20.     On or about March 6, 2015, the IRS issued a notice of their intent to levy rFactr's bank account for the taxes, penalties, and interest owed for the first, third, and fourth quarters of 2013 and the first and second quarters of 2014. On or about April 1, 2015, $14,549.98 was garnished from rFactr's bank account and paid to the IRS to satisfy some of these outstanding balances.

21.     On or about April 25, 2016, the IRS issued a notice to rFactr that it owed $17,558.71 in taxes, penalties, and interest for the fourth quarter of 2014. On or about May 16, 2016, the IRS issued a notice of intent to seize or levy rFactr's property for these unpaid taxes.

22.     On or about June 16, 2016, GENTNER called the IRS. During this call the IRS informed GENTNER that the IRS was missing Forms 941 and tax payments for the third quarter of 2014, all four quarters of 2015, and the first two quarters of 2016. During this call, the IRS warned GENTNER of the potential for enforcement action, including a levy or a lien.

23.     On or about June 18, 2016, the IRS initiated a new collection action concerning rFactr's failure to file Forms 941 and failure to pay the employment taxes for all four quarters of 2015 and the first quarter of 2016.

24.     On or about June 29, 2016, GENTNER emailed G.B., rFactr's fractional Chief Financial Officer, with information on how to make a domestic voluntary disclosure, including a copy of the Internal Revenue Manual Section 9.5.11.9 (12-02-2009). IRM Section 9.5.11.9 stated in relevant part that:

   a)  "The voluntary disclosure practice creates no substantive or procedural rights for taxpayers as it is simply a matter of internal IRS practice;"

   b)  "A voluntary disclosure will not automatically guarantee immunity from [criminal] prosecution;" and

   c)  "A voluntary disclosure occurs when the communication is truthful, timely, complete, and when a taxpayer shows a willingness to cooperate (and does in fact cooperate) with the IRS in determining his/her correct tax liability."

25.     On or about June 30, 2016, rFactr filed a Voluntary Disclosure Application with the IRS. The Application covered all four quarters of 2015 and the first two quarters of 2016.

4

26.     On or about July 7, 2016, Revenue Officer A.W. met with GENTNER at rFactr's office. Revenue Officer A.W. informed GENTNER that a notice of federal tax lien would be filed with Mecklenburg County and the Secretary of State. Revenue Officer A.W. also requested completion of a Form 433-B and other financial documentation and explained the TFRP to GENTNER.

27.     On or about July 7, 2016, the IRS issued rFactr a final notice of intent to levy in the amount of $18,044.58 for the unpaid taxes, interest, and penalties related to the fourth quarter of 2014, which was paid by BRASSER and GENTNER on or about July 13, 2016.

28.     On or about July 18, 2016, Revenue Officer A.W. requested rFactr complete a Form 433-B, file signed Forms 941 for the third quarter of 2014, all four quarters of 2015, and the first and second quarter of 2016, along with supporting documentation, and provide proof of ongoing federal tax deposits.

29.     On or about August 2, 2016, GENTNER caused rFactr to file the delinquent Forms 941 for the third quarter of 2014, all four quarters of 2015, and the first two quarters of 2016, which BRASSER and GENTNER had also submitted to the IRS as an attachment to their Voluntary Disclosure Application. Although each of these Forms 941 reported taxes due and owing, neither BRASSER nor GENTNER made any payments.

30.     On or about August 11, 2016, rFactr received a pre-clearance letter for the Voluntary Disclosure Program directing them to complete the Domestic Voluntary Disclosure Letter and return it to the IRS within 45 days. Per the pre-clearance letter, upon receipt of the completed Letter the IRS would process the request and notify rFactr as to whether they were accepted into the Domestic Voluntary Disclosure Program.

31.     On or about August 24, 2016, Revenue Officer A.W. notified rFactr, through its representative, that the delivery of the Form 433-B would be delayed pending rFactr's acceptance into the Voluntary Disclosure Program and that the TFRP interviews were cancelled. Revenue Officer A.W. also stated that rFactr needed to ensure they "continued to maintain compliance with their Federal Tax Deposit requirement." Despite this admonition, after this date, BRASSER and GENTNER caused rFactr to fail to file any Forms 941 with the IRS and did not timely pay over any employment taxes.

32.     On or about September 21, 2016, rFactr submitted a Domestic Voluntary Disclosure Letter to the IRS. In the letter BRASSER and GENTNER stated: "we take responsibility for the liability, and as stated above, we intend to pay the full liability amount of taxes, interest, and any penalties in an agreed upon payment plan." BRASSER and GENTNER signed the letter under penalties of perjury.

33.     On or about October 12, 2016, GENTNER filed a U.S. Individual Income Tax Return, Form 1040, for the calendar year 2015, under penalties of perjury, which falsely reported

5

that $64,506 in taxes were withheld and paid over to the IRS on his behalf by rFactr. As a result, GENTNER fraudulently received a refund.

34.     On or about October 14, 2016, BRASSER filed a U.S. Individual Income Tax Return, Form 1040, for the calendar year 2015, under penalties of perjury, which falsely reported that $57,836 in taxes were withheld and paid over to the IRS on his behalf by rFactr.   As a result, BRASSER fraudulently reduced his tax due and owing.

35.     On or about October 31, 2016, BRASSER and GENTNER caused rFactr to fail to file the required Form 941 for the third quarter of 2016; they also failed to make any timely employment tax payments to the IRS during the quarter or by October 31, 2016.

36.     On or about November 15, 2016, BRASSER and GENTNER received a letter from the IRS informing them that their domestic voluntary disclosure was received and was "preliminarily accepted as meeting the timeliness requirements." The letter stated in relevant part that:

   a) A "domestic voluntary disclosure will not automatically guarantee immunity from prosecution; however, a domestic voluntary disclosure may result in prosecution not being recommended;"

   b) "Acceptance of your domestic voluntary disclosure will also depend upon whether it is truthful and complete and whether you cooperate with the IRS in determining the correct tax liability and makes good faith arrangements with the IRS to pay in full the tax, interest, and penalties determined by the IRS to be applicable."

   c) rFactr was directed to submit their "complete domestic voluntary disclosure package" to the IRS in Plantation, Florida within 90 days of the date of the IRS letter; and

   d) rFactr's domestic voluntary disclosure would not be complete until the documents were submitted and that they were required to cooperate in the processing of the case, including providing requested documents and submitting to any requested interview.

37.     On or about January 31, 2017, BRASSER and GENTNER caused rFactr to fail to file the required Form 941 for the fourth quarter of 2016; they also failed to make any timely employment tax payments to the IRS during the quarter or by January 31, 2017.

38.     On or about March 22, 2017, the rFactr tax liability was assigned to Revenue Officer A.W. for collection.

6

39.     On or about April 5, 2017, Revenue Officer A.W. spoke with rFactr's representative and informed him that the case was reassigned to field collection for the domestic voluntary disclosure program where the case would proceed with the same collection procedures that began in August 2016. Revenue Officer A.W. informed rFactr's representative that the last employment tax payment by rFactr was made in August 2016 and that rFactr had also failed to file employment tax returns. rFactr's representative was unaware rFactr had stopped making employment tax payments.

40.     On or about April 30, 2017, BRASSER and GENTNER caused rFactr to fail to file the required Form 941 for the first quarter of 2017; they also failed to make any timely employment tax payments during the quarter or by April 30, 2017.

41.     In or about May 2017, rFactr's collection action was reassigned to a new Revenue Officer, B.C. Revenue Officer B.C. unsuccessfully attempted to contact rFactr, GENTNER, and rFactr's representative.

42.     On or about June 2, 2017, the IRS issued a final notice of intent to levy rFactr's property for the taxes, penalties, and interest owed for the third quarter of 2014, all four quarters of 2015, and the first two quarters of 2016.

43.     On or about June 15, 2017, the IRS filed a tax lien in Mecklenburg County for $912,897.23 for the outstanding balances for the employment taxes for the third quarter of 2014, all four quarters of 2015, and the first and second quarters of 2016.

44.     On or about June 19, 2017, BRASSER and GENTNER met with Revenue Officer B.C. During this meeting, Revenue Officer B.C. informed BRASSER and GENTNER about the filing of the federal tax lien and the TFRP. BRASSER and GENTNER submitted a partial Form 433-B, under penalties of perjury, and the delinquent, unfiled Forms 941 for the third and fourth quarters of 2016 and the first quarter of 2017. Although each of these Forms 941 reported taxes due and owing, neither BRASSER nor GENTNER made any payments.

45.     On or about July 24, 2017, GENTNER filed a U.S. Individual Income Tax Return, Form 1040, for the calendar year 2016, under penalties of perjury, which falsely reported that $72,100 in taxes were withheld and paid over to the IRS on his behalf by rFactr. As a result, GENTNER fraudulently received a refund.

46.     On or about July 27, 2017, GENTNER met with Revenue Office B.C. for an interview regarding the assessment of the TFRP. During this meeting GENTNER submitted a signed Report of Interview with Individual Relative to Trust Fund Recovery Penalty, Form 4180, and a Form 433-B and a Form 433-A for himself individually, both under penalties of perjury. Attached to the Form 433-B was a spreadsheet detailing the names of rFactr's investors and the amounts and dates of investment. This spreadsheet only listed investors through March 2017, despite rFactr receiving investor monies after March 2017.

7

47.     On or about July 30, 2017, BRASSER and GENTNER caused rFactr to fail to file the required Form 941 for the second quarter of 2017; they also failed to make any timely employment tax payments during the quarter or by July 30, 2017.

48.     On or about September 13, 2017, the IRS filed an additional tax lien in Mecklenburg County for $309,779.16 for the outstanding balance for the employment taxes for the fourth quarter of 2013, the third and fourth quarters of 2016, and the first quarter of 2017.

49.     On or about September 5, 2017, BRASSER met with Revenue Officer B.C. for a TFRP interview. On or about September 14, 2017, BRASSER submitted to the IRS a signed Form 4180.

50.     On or about September 14, 2017, the IRS notified BRASSER and GENTNER that it proposed to assess the TFRP against them individually for the unpaid trust fund taxes of rFactr, and that they had a right to appeal. The Proposed Assessment of TFRP included taxes due for the third quarter of 2014, all four quarters of 2015 and 2016, and the first two quarters of 2017. In all, $1,183,576.99 comprised the outstanding employment taxes.

51.     On or about October 10, 2017, BRASSER filed a U.S. Individual Income Tax Return, Form 1040, for the calendar year 2016, under penalties of perjury, which falsely reported that $59,091 in taxes were withheld and paid over to the IRS on his behalf by rFactr.   As a result, BRASSER fraudulently received a refund.

52.     On or about October 31, 2017, BRASSER and GENTNER caused rFactr to fail to file the required Form 941 for the third quarter of 2017; they also failed to make any timely employment tax payments to the IRS during the quarter or by October 31, 2017.

53.     On or about November 13, 2017, BRASSER and GENTNER submitted to the IRS Office of Appeals a written protest of the proposed TFRP.

54.     On or about December 7, 2017, the IRS filed another tax lien in Mecklenburg County for $57,734.82 for the outstanding balance for the employment taxes for the second quarter of 2017.

55.     On or about January 29, 2018, rFactr's representative told Revenue Officer B.C. that rFactr had closed and that there was no payroll.

56.     On or about January 31, 2018, BRASSER and GENTNER caused rFactr to fail to file the required Form 941 for the fourth quarter of 2017; they also failed to make any timely employment tax payments to the IRS during the quarter or by January 31, 2018.

8

57.     On or about April 24, 2018, a $90,000 deposit was made into rFactor's Regions checking account x4500 from an rFactr client. None of these funds were used to pay off the outstanding tax liability. Instead, these funds were used by BRASSER and GENTNER for rFactr operating expenses and to pay outstanding payroll to employees.

58.     On or about April 27, 2018, BRASSER and GENTNER opened SunTrust account x8770 in the name of rFactr, despite BRASSER and GENTNER's previous representations to the IRS that rFactr had closed.

59.     On or about December 19, 2018, following rFactr's appeal, the IRS informed rFactr that "the proposed levy action is no longer appropriate since you are out of business and have no distrainable assets from which to collect." The Appeals Officer recommended that "your Collection Due Process balances be reported as uncollectible as an out of business corporation."

60.     Between on or about April 24, 2019, and on or about September 30, 2019, three wires totaling $99,360 were deposited into rFactr's SunTrust account x8770 and rFactr's Regions savings account x9851 from a company in Canada. Portions of these funds were used to make multiple credit card payments and for cash withdrawals.

## BRASSER's Efforts to Evade the Payment the TFRP

61.     On or about May 14, 2018, the IRS assessed the TFRP against BRASSER in the amount of $666,186.82 for the third quarter of 2014, all four quarters of 2015 and 2016, and the first two quarters of 2017. Revenue Agent A.W. was assigned to this collection action, which was separate from the IRS collection effort against rFactr. A balance due notice was issued to BRASSER.

62.     On or about August 1, 2018, the IRS notified BRASSER that he lost his appeal of the TFRP and that his case was being returned "to the Collection function for assessment of the liability as determined by Appeals."

63.     On or about September 18, 2018, the IRS filed a tax lien in Mecklenburg County for $666,186.82 for the TFRP assessed against BRASSER, individually, for the third quarter of 2014, all four quarters of 2015 and 2016, and the first two quarters of 2017

64.     Between on or about May 14, 2018, and on or about December 6, 2021, BRASSER took the following steps, among others, to evade the payment of the TFRP assessed against him:

   a)  Paying for, and causing to be paid, personal expenses from nominee bank accounts, including but not limited to country club fees, luxury furniture, credit card bills, and private school tuition;

9

b) Purchasing, and causing to be purchased, real and personal property in the names of nominees instead of in his own name;

c) Purchasing, and causing to be purchased, real and personal property and paying other personal expenses while falsely representing to the IRS that he did not have sufficient funds to pay the TFRP;

d) Making, and causing to be made, to IRS employees false oral and written statements about his income, expenses, and assets.

## BRASSER's Purchase of Real and Personal Property

65. On or about July 30, 2018, BRASSER caused an offer to be made to purchase a new personal residence on Briarcliff Place for him and M.B. in the name of C.B. The offer was accepted by the seller that day.

66. On or about August 2, 2018, Truliant Federal Credit Union ("TFCU") checking account x3275 and savings account x3267 were opened in the name of M.B.

67. On or about August 2, 2018, BRASSER withdrew $5,000 from his and M.B.'s SunTrust joint checking account x5441 to purchase a $5,000 official check for the due diligence payment for the purchase of their new home located at Briarcliff Place.

68. On or about August 6, 2018, BRASSER and M.B. sold their personal residence located on Sterling Road. The proceeds from that sale, totaling $284,721, were deposited into SunTrust joint checking account x5441; BRASSER endorsed the check.

69. On or about August 7, 2018, BRASSER withdrew $12,000 from SunTrust joint checking account x5441 and purchased a $12,000 official check for the earnest money for the purchase of his new home on Briarcliff Place. On or about August 21, 2018, this contract was terminated and the $12,000 was returned to BRASSER. On or about August 23, 2018, BRASSER deposited this check into SunTrust joint checking account x4709.

70. On or about August 8, 2018, BRASSER transferred, and caused to be transferred, $180,000 from SunTrust joint checking account x5441 to TFCU savings account x3267.

71. On or about August 23, 2018, BRASSER called Select Portfolio, an entity that retained funds in restricted escrow from the sale of Sterling Road and asked them to release the funds because "I'm closing on a new house."

72. On or about August 27, 2018, BRASSER made and caused to be made a new offer to purchase Briarcliff Place, in the name of C.B. This contract was accepted on August 28, 2018.

10

73. On or about August 29, 2018, a $366,961.31 check from Select Portfolio made payable to BRASSER was deposited into TFCU savings account x3267.

74. On or about August 29, 2018, BRASSER deposited a $3,710.39 check made payable to him from Select Portfolio into SunTrust joint checking account x4709.

75. On or about August 29, 2018, M.B. wrote a $7,000 check for earnest money and a $10,000 check for due diligence for the purchase of Briarcliff Place from TFCU checking account x3275.

76. On or about August 29, 2018, C.B. submitted a loan application to Recovco Mortgage for the purchase of Briarcliff Place that included a representation that he received $219,250 as a gift from M.B.

77. On or about August 31, 2018, SunTrust account x9121 was opened in the name of C.B.

78. On or about September 11, 2018, $413,000 was transferred from TFCU savings account x3267 to SunTrust account x9121.

79. On or about September 26, 2018, $415,000 was transferred from SunTrust account x9121 to the closing attorney for the purchase of the home on Briarcliff Place.

80. On or about October 12, 2018, the contract to purchase Briarcliff Place was amended to include M.B. as a purchaser. M.B. and C.B. purportedly signed the Amendment to Contract.

81. On or about October 18, 2018, M.B. and C.B. closed on the purchase of Briarcliff Place. The email address listed for both M.B. and C.B. was BRASSER's email address.

82. On or about April 8, 2020, C.B., M.B., and BRASSER, all listed as the grantors, transferred title to Briarcliff Place to BRASSER and M.B for no consideration.

### BRASSER's Use of Nominee Bank Accounts to Pay for Personal Expenses

83. On or about October 22, 2018, BRASSER wrote and signed a $3,500 check from SunTrust account x9121 to Concrete Significance.

84. On or about October 29, 2018, a $2,743.75 wire was made from SunTrust account x9121 to a private school.

11

85.     On or about the dates listed below, payments were made from SunTrust account x9121 to Capital One for personal expenses paid for with BRASSER and M.B.'s credit cards listed below:

| Date | Payment Amount | Capital One Account Ending |
|------|----------------|----------------------------|
| November 1, 2018 | $4,970.21 | x8317 |
| November 27, 2018 | $3,132.79 | x8317 |
| November 28, 2018 | $2,770.91 | x3465 |
| December 11, 2018 | $3,003.08 | x3465 |
| December 31, 2018 | $4,567.83 | x8317 |
| December 31, 2018 | $3,214.85 | x3465 |
| January 22, 2019 | $3,003.82 | x8317 |
| August 5, 2019 | $3,500 | x8317 |
| August 5, 2019 | $1,000 | x3465 |
| September 30, 2019 | $4,819 | x8317 |
| September 30, 2019 | $1,452 | x8317 |
| September 30, 2019 | $3,753.64 | x5250 |

86.     On or about November 2, 2018, a BRASSER wrote and signed a $1,816.78 check from SunTrust account x9121 to Concrete Significance.

87.     On or about the dates listed below, payments were made from SunTrust account x9121 to Discover Card for personal expenses paid for with BRASSER's credit card:

| Date | Payment Amount |
|------|----------------|
| November 2, 2018 | $10,539.67 |
| November 28, 2018 | $7,817.38 |
| December 31, 2018 | $11,805.67 |
| January 22, 2019 | $2,941.18 |

88.     On or about November 2, 2018, a $4,000 check from SunTrust account x9121 purportedly signed by C.B. was made out to M.B. for repayment of rent. On or about November 2, 2018, this check was deposited into SunTrust joint checking account x5441 and was purportedly endorsed by M.B.

89.     On or about November 26, 2018, a $2,583.44 payment was made to Carolina Golf Club for BRASSER's membership using the debit card for SunTrust account x9121.

90.     On or about December 27, 2018, a $116,260.66 check from an insurance company made payable to BRASSER was deposited into SunTrust account x9121. The check was endorsed by BRASSER.

91.     On or about January 3, 2019, a $5,991.32 wire was made from SunTrust x9121 to a private school.

12

92.     On or about January 29, 2019, a $112,139.31 check from SunTrust account x9121 to M.B. was deposited into TFCU checking account x3275.

93.     On or about January 31, 2019, a $2,615 check from SunTrust account x9121 was made to M.B. for rent. This check was deposited by M.B. and BRASSER into SunTrust joint checking account x5441.

94.     On or about February 25, 2019, BRASSER purchased a 2018 Infiniti QX80 for $64,768. In completing the purchase, BRASSER received a $21,000 trade-in allowance for the 2014 Infiniti QX80 that he previously told Revenue Officer A.W. was M.B.'s vehicle. BRASSER listed Briarcliff Place as his address.

95.     On or about February 28, 2019, a $2,615 check from SunTrust account x9121 was made to M.B. for rent. This check was deposited into SunTrust joint checking account x4709 and the check was purportedly endorsed by M.B.

96.     On or about March 11, 2019, BRASSER deposited a $16,188.76 payroll check from the Consulting Group into TFCU checking account x3275. The check was endorsed by BRASSER and M.B.

97.     On or about March 29, 2019, a $2,615 check from SunTrust account x9121 was made to M.B. for rent. On or about April 17, 2019, M.B. deposited this check into TFCU checking account x3275.

98.     On or about April 11, 2019, a $5,200 check from SunTrust x9121 was made to M.B. for "repayment 4 car, furniture, and med." On or about April 17, 2019, M.B. deposited this check into TFCU checking account x3275.

99.     On or about November 25, 2019, BRASSER was added to TFCU checking account x3275 and savings account x3267.

100.    On or about November 27, 2019, a $25,621.01 check from an insurance company made payable to BRASSER was deposited into SunTrust joint checking account x4709. The check was endorsed by BRASSER and M.B.

101.    On or about December 13, 2019, BRASSER and M.B. opened JP Morgan Chase joint checking account x2903 and joint savings account x6297.

102.    On or about January 27, 2020, a $15,548.01 deposit was made to JP Morgan Chase joint checking account x2903 from C.B. The wire instructions stated it was for "reimbursement for list of personal expenses."

103.    On or about December 15, 2020, BRASSER deposited a $165,857.92 bonus from the Consulting Group into JP Morgan Chase joint checking account x2903.

13

## BRASSER's False Oral and Written Statements to IRS Employees

104.     Between August 7 and August 13, 2018, BRASSER made payments from SunTrust joint checking account x5441 for his personal benefit, including more than $13,000 in payments to credit cards, a $11,948 wire to a private school, and a $22,708.76 wire to Infiniti Auto Loan to pay off a 2014 Infiniti QX80 registered to him.

105.     On or about September 5, 2018, Revenue Officer A.W. contacted BRASSER's representative and informed him that he was assigned to collect the TFRP.

106.     On or about September 10, 2018, Revenue Officer A.W. informed BRASSER's representative that a notice of federal tax lien would be filed with respect to BRASSER personally. Revenue Officer A.W. requested submission of a Form 433-A by October 19, 2018 and required that BRASSER attach six months of bank records and supporting documentation for the assertions reported in the Form 433-A.

107.     On or about October 18, 2018, BRASSER submitted a Form 433-A, under penalty of perjury, and supporting documentation to Revenue Officer A.W. The Form 433-A disclosed only two bank accounts –SunTrust joint checking account x5441 and SunTrust joint checking account x4709. BRASSER falsely stated in a letter that accompanied the Form 433-A, that "we require assistance and support from our families to make ends meet. I do not have much to show for the last few years in the way of assets."

108.     On or about December 4, 2018, Revenue Officer A.W. raised concerns about BRASSER's previously submitted Form 433-A and requested additional information, including:

a) Requested images of all deposited items contained in the previously submitted SunTrust joint checking account x5441 bank records with a break-down of amounts received from consulting work, insurance proceeds, friends/family, or other sources because the previously submitted bank records showed substantially higher deposits than income claimed on the Form 433-A;

b) Requested confirmation of current mailing and physical address, whether the location was rented or leased, and a copy of the lease agreement;

c) Requested a copy of the settlement statement for the sale of Sterling Road;

d) Requested an explanation of the $284,721.81 deposit on August 6, 2018, into SunTrust joint checking account x5441;

e) Requested an explanation and copy of outgoing wire instructions for $180,000 wire transfer from SunTrust joint checking account x5441 on August 8, 2018, and copies of the most recent 6 months of account statements if any control or ownership was exercised over receiving account;

14

f) Requested an explanation for the $12,000 counter withdrawal out of SunTrust joint checking account x5441 on August 7, 2018; and

g) Requested ownership, encumbrance (if any) and vehicle information to correspond to Charlotte Infiniti payments evidenced in bank records previously provided by BRASSER.

109.    On or about January 4, 2019, in response to Revenue Officer A.W.'s December 4, 2018 request for information, BRASSER, through his representative, submitted the following explanations to Revenue Officer A.W.:

a) BRASSER provided images of the deposit items and regarding his sources of income BRASSER stated that between March and August 2018 he had consulting income of $12,750 and $9,200;

b) Regarding BRASSER's physical address, BRASSER stated he "sometimes lived at Briarcliff Place, and also with a few different friends. Unfortunately, the Brasser family is currently not in a stable home;"

c) BRASSER provided a copy of the Sterling Road settlement statement;

d) Regarding the $180,000 wire transfer from SunTrust joint checking account x5441, BRASSER explained that "the funds were M.B.'s portion of the house sale. BRASSER did not have any ownership or control over this account;"

e) Regarding the $12,000 withdrawal out of SunTrust joint checking account x5441 BRASSER explained it "was intended for payment towards a new place where the Brassers could live. That plan did not work out.;" and

f) Regarding the Charlotte Infiniti payments, BRASSER stated "[t]he Infiniti was M.B.'s vehicle which was paid off."

110.    On or about January 11, 2019, a Consulting Group offered BRASSER employment with a starting salary of $285,000 and the potential for a year-end bonus of up to $313,500. On January 18, 2019, BRASSER accepted employment with the Consulting Group, receiving a $50,000 signing bonus. As part of the onboarding paperwork, BRASSER reported his home address as Briarcliff Place.

111.    On or about January 22, 2019, BRASSER obtained a new North Carolina driver's license listing his home address as Briarcliff Place.

112.    On or about March 7, 2019, after reviewing the documentation provided on January 4, 2019, Revenue Officer A.W. informed BRASSER's representative that more than half

15

of the proceeds from the sale of Sterling Road were given to M.B., and Revenue Officer A.W. requested that the amount exceeding one-half of the proceeds be returned and applied to the tax debt.

113. On or about April 10, 2019, BRASSER's representative informed Revenue Officer A.W. that the excess funds from the sale of Sterling Road were provided to M.B. because she was taking care of the children, did not work, and had no other income. BRASSER's representative also stated that the money had already been spent and was used to pay for necessary living expenses. Revenue Officer A.W. requested verification, including M.B.'s bank records to confirm that the funds were used for family wellbeing.

114. On or about May 7, 2019, BRASSER, through his representative, provided additional information in response to Revenue Officer A.W.'s questions concerning the TFCU account and the purchase of Briarcliff Place. Despite BRASSER having access and control over both TFCU checking account x3275 and TFCU savings account x3267, BRASSER only provided a spreadsheet of expenditures from TFCU checking account x3275. The spreadsheet did not cover the time-period requested, did not include the supporting checks, and omitted any detail about the deposit items. BRASSER, through his representative, also falsely claimed that BRASSER "was and is not involved" in the purchase of the house and that he mostly resided with friends.

115. On or about June 3, 2019, BRASSER's representative asked the IRS to place BRASSER in "noncollectible" status because he does not have "much to use towards" an Offer in Compromise.

116. On or about July 19, 2019, BRASSER's representative stated he needed further time to investigate the purchase of the house in M.B. and C.B.'s name.

117. On or about August 1, 2019, Revenue Agent A.W. inquired of BRASSER's representative about BRASSER's current financial status. BRASSER's representative falsely stated that BRASSER was still a self-employed consultant and that his work was minimal and irregular, but that he had not spoken to BRASSER in a few weeks. Revenue Officer A.W. informed BRASSER's representative that a summons was issued for the TFCU bank accounts for the time-period January 1, 2018 through May 31, 2019, and that further investigation into the house purchase may be pursued, including a summons for closing documents.

118. On or about September 4, 2019, BRASSER's representative informed Revenue Officer A.W. that BRASSER was now working and was also now living at Briarcliff Place. Revenue Officer A.W. requested an updated Form 433-A with three months of supporting documentation.

119. On or about October 4, 2019, BRASSER submitted a second Form 433-A, under penalty of perjury, to Revenue Officer A.W. that did not list as his asset the 2018 Infiniti QX80 purchased by BRASSER in February 2019. Accompanying the submission, BRASSER's

16

representative stated that "the housing situation…is in a bit of flux" and that "at this moment" BRASSER was living at Briarcliff Place with his family.

120.    On or about October 8, 2019, BRASSER submitted a letter to Revenue Officer A.W. to accompany the Form 433-A. In the letter, BRASSER took "full responsibility" for rFactr's tax debt. BRASSER stated his father purchased Briarcliff Place with M.B. as an investment and that BRASSER used his email rather than his father's email on the communications because his father was old and did not like to text or email. BRASSER also said that he was not included in the purchase of the home because of his "lack of funds, financial history, and terrible credit." BRASSER said his father did not intend to live with them, but in September 2018 he fell and suffered medical issues that required him to live with M.B. at Briarcliff Place.

## COUNTS ONE THROUGH FIVE
### 26 U.S.C. § 7202
(Failure to Truthfully Account for and Pay Over Trust Fund Taxes)

121.    The Grand Jury realleges and incorporates by reference herein, all of the allegations contained in paragraphs 1 through 60 of the Bill of Indictment, and further alleges that:

122.    BRASSER and GENTNER were persons required to collect, account for on quarterly Forms 941, and pay over to the Internal Revenue Service on behalf of rFactr, trust fund taxes imposed on its employees by the Internal Revenue Code.

123.    On or about the dates listed in the table below for each count herein, in the Western District of North Carolina and elsewhere, the defendants,

### (1) RICHARD BRASSER
### and
### (2) GREGORY GENTNER,

did willfully fail to truthfully account for and pay over to the IRS the trust fund taxes due and owing to the IRS on behalf of the employees of rFactr:

| Count | Due Date of Form 941 | Quarter Ended |
|-------|----------------------|---------------|
| 1 | October 31, 2016 | September 30, 2016 |
| 2 | January 31, 2017 | December 31, 2016 |
| 3 | April 30, 2017 | March 31, 2017 |
| 4 | July 31, 2017 | June 30, 2017 |
| 5 | January 31, 2018 | December 31, 2017 |

All in violation of Title 26, United States Code, Section 7202.

17

# COUNTS SIX and SEVEN
26 U.S.C. §7206(1)
(Making and Subscribing a False Tax Return)

124.    The Grand Jury realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 60 of the Bill of Indictment, and further alleges that:

125.    On or about the dates set forth below, in the Western District of North Carolina, and elsewhere, the defendant,

## (1) RICHARD BRASSER,

a resident of Charlotte, North Carolina, did willfully make and subscribe the following U.S. Individual Income Tax Returns, Forms 1040, for the calendar years set forth below, which were verified by a written declaration that they were made under the penalties of perjury and which BRASSER did not believe to be true and correct as to every material matter. The tax returns reported total payments on Line 74 in the amounts set forth below, whereas, as he then and there well knew and believed, the total payments on Line 74 were substantially less than the amount reported.

| Count | Approximate Filing Date | Year | False Item | False Item as Reported |
|-------|-------------------------|------|------------|------------------------|
| 6 | October 14, 2016 | 2015 | Line 74, total payments | $57,836 |
| 7 | October 10, 2017 | 2016 | Line 74, total payments | $59,091 |

All in violation of Title 26, United States Code, Section 7206(1).

18

## COUNTS EIGHT and NINE
### 26 U.S.C. §7206(1)
### (Making and Subscribing a False Tax Return)

126.     The Grand Jury realleges and incorporates by references herein, all of the allegations contained in paragraphs 1 through 60 of the Bill of Indictment, and further alleges that:

127.     On or about the dates set forth below, in the Western District of North Carolina, and elsewhere, the defendant,

### (2) GREGORY GENTNER,

a resident of Charlotte, North Carolina, did willfully make and subscribe the following U.S. Individual Income Tax Returns, Forms 1040, for the calendar years set forth below, which were verified by a written declaration that they were made under the penalties of perjury and which GENTNER did not believe to be true and correct as to every material matter. The tax returns reported total payments on Line 74 in the amounts set forth below, whereas, as he then and there well knew and believed, the total payments on Line 74 were substantially less than the amount reported.

| Count | Approximate Filing Date | Year | False Item | False Item as Reported |
|-------|------------------------|------|-----------|------------------------|
| 8 | October 12, 2016 | 2015 | Line 74, total payments | $64,506 |
| 9 | July 24, 2017 | 2016 | Line 74, total payments | $72,100 |

All in violation of Title 26, United States Code, Section 7206(1).

19

**COUNT TEN**
26 U.S.C. §7201
(Evasion of Payment)

128.    The Grand Jury realleges and incorporates by reference herein, all of the allegations contained in paragraphs 1 through 120 of the Bill of Indictment, and further alleges that:

129.    Beginning on or about May 14, 2018 and continuing until on or about December 6, 2021, in the Western District of North Carolina, and elsewhere, the defendant,

## (1) RICHARD BRASSER,

willfully attempted to evade and defeat the payment of the Trust Fund Recovery Penalty, and associated penalties and interest, due and owing by him to the United States as a responsible person for rFactr for the third quarter of 2014, all four quarters of 2015 and 2016, and the first two quarters of 2017, by committing the following affirmative acts, among others:

       a.    Paying for, and causing to be paid, personal expenses from nominee bank accounts, including but not limited to country club fees, luxury furniture, credit card bills, and private school tuition;

       b.    Purchasing, and causing to be purchased, real and personal property in the names of nominees instead of in his own name;

       c.    Purchasing, and causing to be purchased, real and personal property and paying other personal expenses while falsely representing to the IRS that he did not have sufficient funds to pay the TFRP; and

       d.    Making, and causing to be made, to IRS employees false oral and written statements about his income, expenses, and assets.

All in violation of Title 26, United States Code, Section 7201.

A TRUE BILL:

FOREPERSON

20

DENA J. KING
UNITED STATES ATTORNEY

CARYN FINLEY
ASSISTANT UNITED STATES ATTORNEY